Good morning. May it please the court, my name is Rebecca Smith and I represent the appellate's Friends of the Wild Swan et al. I would like to reserve three minutes for rebuttal. I'd like to start out today by addressing what is probably the most clear violation of the National Forest Management Act in this case, which is the Forest Service's complete failure to address the elk open road density standard in the project environmental assessment. In briefing, this issue has become quite clear. The government has candidly conceded many of these points for us. In the answer brief at 24, they say, quote, the Forest Service did not explicitly address this provision. In the response to the 27-3 motion, which is docket entry 27-1 at 15, they say, quote, the Forest Service did not map moist sites in the Beaver Creek project area or separately calculate road densities specific to this site. So not only do they – Let's say we agree, which I – let's just go hypothetically there. We haven't decided this case, so I'm just – but let's say hypothetically we were to say you lose on your others, but you're right on that. Can we talk about remedy? Yes. And it seems to me that you've moved the ball a bit on what you're saying here. And that – and, you know, at the risk of seeming ignorant, I'm going to ask both of you on this point. Let's say we were to say the government's right on everything but the moist areas for the elk. And so we affirm there, but we say you didn't get it right there. This project's been going on, I'm assuming, at this point, or – well, they got some – nothing's happened? You're shaking your head. But anyway, so how does that – and now you're asking for an injunction, and I haven't seen – we haven't talked about any of the type of things that people do in an injunction. So what's the practical effect of this? Now there's a new forest plan. And now there's a new forest plan. If you win, do you still have compliance? And you're already contesting that, right? Maybe I better let you answer Judge Callahan's question first. I think I have about ten questions. Yes, there is. It's all. Yeah, so what if? So there is actually an injunction in place. The February motions panel did grant an injunction against the project, and that was based on this claim. And so the question before that was has the project started. The project was never implemented. And so the motions panel granted the injunction before any implementation happened. But what do you want now? And so what we want is for them to still conduct the NEPA analysis that addresses this forest plan standard. And that goes to your question about the new forest plan that's now in place. So would they analyze it under the new one? Or if we said everything was okay on the rest of it, do they have to do the whole thing, start over completely, or? So that sort of brings up why we, as you say, move the ball from our opening brief to our reply. We don't want vacater anymore. Right. Because then there's a new forest plan in place. Yes. And so you win by forcing the government to comply with a less robust forest plan, or to start over and then have to comply with a new forest plan. Yes, you're saying if the decision is vacated. And, of course, we presume vacater. That's what we, right? That's our default. That is true, Your Honor. That is true. I have a right to it, and I'm listening. What the Supreme Court said in Monsanto was that they prefer decisions be vacated if that is a remedy that gives you the relief that you're requesting. Here, the relief they're requesting is not just an injunction, but also that they conduct this analysis. And so because that's part of our request, that is why this would be a circumstance where vacating the decision would not actually give us the full relief that we're requesting here. Right. It's a small project, and I think your strongest argument for sure is that they didn't map the moist sites. And I don't have a good sense, even though it's a small project, I don't have a good sense of how tough it is to give you what you want if what you want is do the work, show your work, map the sites. And if they could do that really quickly, then does that? Then they're back in the game. Your Honor, what we're asking really is for the injunction that was already issued to just stay in place on remand while they do this new analysis. And it is fairly easy for them to do. We filed as an exhibit to both our reply brief and 27th remotion an analysis from a directly adjacent logging project where they did the exact analysis that we're requesting here. How big was that project? About the same size. Okay. So can we go back to I think they have a problem because they didn't map. I can't find the moist sites. They didn't do that. I think they conceded that point. But what about the district court's reasoning here where he found some, this is my word, substantial compliance that he thought because there's 96% you know what I'm referring to. Yeah. What's wrong with the district court's reasoning? So, Your Honor, first the district court accepted the Forest Service's That was at ER 32. You win on that point. Right. And then the district court went on to say, quote, the court concludes that the EA's conclusion that the project's moist areas are located away from roads and contain high security is basically, he says, is not completely contradictory to the Forest Plan. And our point is that that conclusion, that moist areas are far away, is just a conclusion. And NEPA and NIFMA require some underlying data for a conclusion like that. And here in briefing they admitted they didn't actually map those moist sites. You're still not really giving fair weight to opposing counsel's argument. I just want to give you an opportunity. You're going to be able to come back to the podium. But he's got more than that. But regarding just the district court's error is what I'm just addressing here, is that the district court relied on a conclusion that had no underlying support. And this is very similar to this court's decision, which was cited in our brief Wild Earth Guardians v. Conservation. That was a case where the Forest Service had failed to map big game winter range. And instead they had just included a percentage in the EIS. And this court found you can't just give us a percentage. We need to know what the data was. How did you determine the percentage? And they said you don't necessarily have to map it, but you do have to give the public the underlying data so that they know that your conclusion about where these areas are is actually valid. And they discuss at length the NEPA regulations. They discuss Idaho Sporting Congress v. Thomas. They say, quote, the EIS lists the percentage of big game winter range, but provides virtually no information about where the big game winter age is actually located. In other words, the EIS does not make public the underlying environmental data, nor specifically reference any documentary source that the Forest Service relied upon in making its determination. And that is 790 Fed Third at 925. That's a 2015 opinion. That was the closest case we could find, because they're actually talking about elk habitat, just as we are here, that you can't just give a percentage or say it's very far away from here, don't worry about it. You actually do have to give the public the underlying data. And that is why we pointed to this adjacent timber set where they did just that. And that is the analysis that we would request on remand as part of a NEPA analysis. If there's no further questions on that, I'd like to move on to the two grizzly bear issues. Regarding the first issue, whether sort of a preliminary issue in this case is whether the, these objectives are enforceable. Well, since you're going to the other ones, you know why? Yeah. So, but if you win on the moist, what are your advantages? If you went on the grizzlies too, or what are the disadvantages? What additional benefit would we get from that? Yes. We would get potentially fewer roads in this project area, which would impact grizzly bears and provide for better habitat. So really the primary issue in terms of remedy for this grizzly bear claim is that we don't want stored roads. We want decommissioned roads because decommissioned roads don't displace grizzly bears. Stored roads do displace grizzly bears. So the practical benefit to us of prevailing on the grizzly bear issue would be that they would need to decommission more roads instead of just storing them, which would then displace fewer grizzly bears. That would be the practical effect of this. And that would be a similar effect for the elk issue if they had to do the analysis and then as a result of the analysis find out they had to have fewer roads. But the difference is that the elk issue addresses only open roads. Is the new plan different on the roads? The new plan is totally different on a lot of issues. It doesn't have either one of these standards in place, but it already is currently in litigation. And so is it possible that they could just say if they, you know, for whatever the court said or if they lost, if say like they prevail on 99% but they don't prevail on 1%, just say, oh, hey, we're just going to do it. We're going to do it. We're going to do it all under the new plan. I mean, they're not compelled to stick with this, right? Well, they are, you mean on remand? Yeah, right. Okay. They could say, well, we'll just come up with a new plan under what? They could withdraw their, if the court just kept the injunction in place and remanded, they could on their own accord simply withdraw the project decision and then design a new project under the new plan. But the catch there is that it couldn't just be a new analysis on elk and grizzly bears. They would then have to apply all of the new standards in the new plan, which would basically mean they start at the beginning of a NEPA process with scoping, do the draft EIS, the final EIS, the decision. And I just sincerely doubt they want to do that long of a brand new process for this project. Well, if we felt that it was very minimal what they had to do, I'm just sort of doing the hypothetical things, can we dissolve the injunction and then just say go back and do that? And as soon as you do that, then you can go ahead? Or, I mean, how does the, if they go back and do it, who dissolves the injunction? Or if we, because obviously when you weigh on an injunction, you're looking, there's certain factors that we all look at and the likelihood of success. And if we're convinced at this point that it's really sort of a ministerial thing and so you don't have a likelihood really of success, could we dissolve the injunction here? You could, Your Honor, if the remedy was going to be vacating the project decision. It's either vacature as a presumptive remedy or just leaving the injunction in place. And if you left the injunction in place, then the district court could simply dissolve the injunction after the remand was completed, which the district court has done in a number of other similar cases. That is to say, if we were to hold, with respect to grizzly bears, that it's fine, but with respect to elk and the moist mapping, moist site mapping, the injunction stays until that's fixed. Correct. As soon as that's fixed, the district judge on his own can then dissolve the injunction. Correct. So they would file a motion to dissolve the injunction in the district court. And is that an available course for us? Yes, Your Honor, it is. Okay. So that would save having to go back and redo everything under the new forest plan. Correct. There would still need to be an analysis process, a public process that complied with NEPA, but they wouldn't have to redo everything. All they would have to do is redo for the elk. Whatever the remand was, yes. And I just want to, before I reserve my time for rebuttal, I did just want to touch very quickly on the district court's ruling that the objectives were not enforceable. Other than all of the statements in the Amendment 19 Environmental Assessment, which repeatedly said the objectives were enforceable, the district court specifically in its order only addressed the summary of Amendment 19. And I'm looking now at ER 27, where the court held that Amendment 19 itself does not clearly indicate whether the objectives are mandatory. And they're citing there to ER 504. ER 504 says Appendix A provides the complete text of these changes, the principal changes are. And then in the summary, that page the district court cited is just a summary. And it says our objective is to, et cetera. However, if you look at Appendix A, which is the complete text of the forest plan, it uses different language. And Appendix A is at ER 531. And it says, quote, the following desired levels will be attained within 10 years. And within five years, the following will be attained. And then at ER 532, it says specifically the objectives are not discretionary. And so I just wanted to clarify. Here's my problem with the mandatory nature of the objection, objectives as distinct from standards. If this project didn't exist, it's obvious that the objectives wouldn't be satisfied. Still wouldn't be satisfied. Correct. And to the extent that this project has any effect at all, it's to move, not very much, but to move toward the satisfaction of the objectives. So you're saying what? I mean, with respect to the objectives, we want you to leave it alone and make less progress toward the achievement of those objectives than this project would actually do. That doesn't make any sense to me. We want them to be decommissioning roads so that they meet these objectives. They did design the Beaver Creek subunit in this project to meet these objectives at the close of the project. It's only the Buck Holland subunit that they didn't design. And that's sort of a fundamental inconsistency is when they argue it's not enforceable, but for one subunit they are designing it to meet the objectives, and for the other they're not. But that doesn't follow. You can do something because it's a good idea, or you can do something because it's absolutely required. Well, another flaw in their argument, Your Honor, is that it basically renders superfluous the deadline. So if the objective just said we want to meet these standards at some point, then it wouldn't be enforceable because It just can't be the case. Under your view of how this works, you'd never be able to do a small project. Even if it moves the needle some in the right direction, you'd never be able to do it. Well, if you weren't at the 5- or 10-year deadline, you wouldn't have to meet the 5- or 10-year deadline. Counsel, I think that's tough. Before you come back up, I just want to give you a quick circle back to what I was referring to earlier because I don't think we didn't communicate. I'm just concerned about the government's brief at 46. It makes the representation that only 6% of the Beaver Creek subunit had open road density above the 1 mile per square mile. And then on the next page, it talks about, and it cites to ER 323, that most of the moist sites, admittedly not mapped, but most of them are away from the road. And then I sort of coupled that with, and then I'll let you go, but I coupled that with, one moment. Which I am going to try to find really quickly. ER 704 and ER, well, if I can put my hand on it, that they only have to show, come to, oh, here we go. ER 685, that the open road densities must average 1 mile or less. Just average. And putting those two together, I'm not so sure I'm ready to give up on the district court's ultimate conclusion. Would you like me to just quickly address those? Sure. Sure. So the one. It would be most efficient to do it that way. Okay. The 1 mile or less is within the area around the moist site. And what we saw from the adjacent Glacier Loon project is that means they have to map the moist site, map a half mile buffer on the site, and then the average is within that specific area. And so without mapping the moist site, we have no idea what the average is. Regarding the thing you cited at page 46, 6% open road density, that's for the grizzly bear standard. They also admit that during the project it's going to be as high as 30%, which then begs the question, doesn't that mean that a third of the project area violates this standard? But actually, we can't superimpose those grizzly bear calculations onto the elk because the forest plan requires two different scales of analysis. Thank you. Yes. And that's what this court talked about in neighbors of Cutty Mountain. You can't use a giant project as an analysis area when that forest plan required an analysis within each woodpecker home range. And so here the analysis has to be the area around the moist site, not an entire grizzly bear subunit. Okay. Thank you. Okay. Let's hear from the government and we'll give you a chance to respond. May it please the Court. Good morning, Your Honors. John Smeltzer for the Forest Service. Your Honors, this project is designed to be good for forest health and wildlife habitat, including habitat for elk and for the grizzly bear. Plants don't challenge the Forest Service determination that the project will overall improve habitat. They nitpick with particular standards, saying it doesn't go far enough with respect to the bear to meet certain forest objectives, and that with respect to the elk, they didn't sufficiently, for temporary limited increases in open road density, meet the standard that applies to the elk summer moist area. Well, you could have done better. They do correctly point out that moist sites is defined, and we can't find moist sites. They're not identified. Moist sites are generally defined in the 1985 study by Lyon. Right. And the Forest Service looked to that definition of moist site. What we say in our brief is the term area with moist site is not defined. But the Forest Service looked to the Lyon definition. First of all, this distinction you just made is a distinction with a difference. What am I missing there? That sounds like lawyer talk, so tell me why that matters. Right. The standard that's at issue, the one mile per square mile average road density, applies to the term area with moist site, not just specifically with the moist site. Did you map the moist sites? We did not for this project map the moist sites. Why not? Your Honor, the relevant question is, did we do enough? Counsel, I know what my question is. Don't tell me what my question is. I understand. The record doesn't say why they didn't do. It's a negative question. They didn't do it, but what they did do is they used data. If you look at the excerpts of the record, page 325, they referenced spatial forest and habitat data, which they used to determine where the moist sites were in this project area. And then they, in a narrative description, told the public that these moist sites are away from the roads in the project area, and they're in primarily the Mission Mountain Wilderness, which has no roads. It's a roadless area. It has zero miles per square mile road density. And putting that together, we believe that's sufficient, Your Honor, to show that the project meets that one mile per square mile standard. Your Honor, the plaintiffs pointed in their brief to a couple of maps to try to show that there are moist sites in the roaded area of the project, but that, again, it's contradicted by the information that's in the project record, and the court should be aware that the maps that are in the reply brief, the map of the roads is first of all roads and not simply open roads, which is the relevant metric. But more significantly, the map that shows streams and riparian areas is not relevant to determining elk moist sites, because an elk moist site, as it's defined in Lyon at page 754 of the excerpts of record, and that's talked about at page 323 of the environmental assessment, are particular areas used by elk that are moist, but also are associated with particular habitat types. And what the record refers to is specifically the habitat type Obeas laciocarpa, which is the scientific name for subalpine fur. And what they're talking about is habitat types that have this – or areas of the forest that have not only moisture, but that have this particular type of habitat. And so when you look at page 325 of the excerpts of record, when they refer to the spatial forest stand habitat data – Hold on. 325. Forgive me. 325. Okay. All right. That's what refers to the habitat data for the forest. And that's where they identify that this Obeas laciocarpa or subalpine fur habitat is not in the area of the project where there are roads, but is in the areas away from the roads in the Mission Mountain Wilderness Area. The district court was a lot closer to this. This is a very careful and conscientious district court judge who I think was taking – giving us his best shot. You're connecting the dots a lot more than I can from the district court judge's opinion, right? I don't – the rationale you're giving now I don't see in the court's opinion. Right. But this is – of course, it's a de novo standard for this court to look at the record. And I'm filling in the evidence. My question, counsel, is whether or not you're – you know, I appreciate that. As you may have gleaned, I've been trying to do the same with the record here. As I said, I think the judge is very conscientious – approaches very conscientiously. So that's what I'm trying to do as well. Are you arguing – here's my question. Are you arguing something now that you did not argue before the district court? No, Your Honor. I mean, we're arguing that the record showed that the areas with moist sites were in the – that's the same thing we argued before. So if we said you didn't do enough, where does that put you and what remedies are available? And I want to sort of – that both sides have a little bit of, I guess, to quote a word that isn't a word, strategery in mind in terms of how they would want that to occur. Your Honor, I think we would agree that if the court would have a limited remand, that would just be to look at this issue of mapping the elk moist sites. We would request that the project be allowed to go forward, that the injunction pending appeal not be maintained in that context because we don't think the standards for an injunction pending appeal could be met. Well, how is that possible? If we decide that we need to remand so the public gets the information it needs, how would we in good faith allow the project to go forward before that task is completed, please? Well, Your Honor, the equities we think would favor ultimately the – Because it's a small project or because – Because it's an important project to move forward and it involves improving habitat overall, and there's no indication from the record that ultimately there would be a violation. But wouldn't the district court be in a better position to ascertain that after you do whatever you're going to do, whatever you would do, to go and say – The fundamental point I think I need to back up and make is the plaintiff's request in order that would compel the Forest Service to comply substantively with the 1986 Forest Plan as amendment, that we submit would be inappropriate because as Judge Callahan, as you pointed out, the Forest Service is always free to reconsider a project and can reconsider it under the existing 2018 Forest Plan. So there's nothing legally out there that says you have to do it under the same standard that you did before? That's why they've asked for a remand without setting aside the project because they don't want the new Forest Plan to come into play. But we concede that if it's remanded with a vacant or with setting it aside, the Forest Service will have to go back and reissue the project under the new Forest Plan. I don't know that it would require all of the new NEPA analysis that plaintiffs are suggesting, but it would require re-noticing, which would take some time. And so this court has, in various cases, in cases where they found a violation, not issued a set aside the project, but has allowed it to proceed with a limited injunction asking for particular information. I mean, that's the normal order. Well, not necessarily allow it to proceed in the interim. I think the proposal might be the injunction stays until the elk problem is resolved, at which point it can be dissolved. But you say the injunction can be dissolved now in the anticipation that the elk problem will be resolved? That's kind of anticipating something that hasn't happened yet. I guess what I'm saying, had there not been an injunction pending appeal, the ordinary case where this court remands without a vacant, or if there's no setting aside, it ordinarily means the project can go forward and the remand is to own the equities and the remand is to allow something particular. But if the court's limited remand in this case, whereas this suggested, I'm not arguing that the court could not do that. You're not arguing the court could not do that. Could not issue a limited remand and leave the injunction pending appeal in place. What is the advantage of saying you did everything right except the moist sites? But then you want to analyze the moist spots in terms of the new plan and the other was under the old plan. How does that work? If the court is imagining it's a limited injunction just to the Forest Service to provide further information, then the Forest Service would provide that information, get it back to the district court, and presumably, if it satisfies the district court, we'd be good to go. That would be quicker than re-noticing the project. Opposing counsel represented that that wouldn't be very hard or take very long. I have no idea what that means. Can you tell us, your best guess, about what are we talking about here? How burdensome is this given the size of the project? To do the analysis for the moist sites? I don't believe it would take very long, Your Honor. Just that aspect of it. That's what she said to me. In government, not taking very long, coming five years. Yeah, I didn't place this question specifically to the Forest Service. I imagine it could be a matter of weeks for them to prepare this. We could do that. Of course, the overriding concern for me, the underlying concern, I should say, is the fire season. And so what would happen if we could remand this and you think your client could have that project or that part of the additional work done within a matter of weeks? Could this go forward then yet this spring? Well, there's spring timing restrictions on harvest as part of the project plan. Would we lose the whole forest season? That's what I'm really talking about. No, that would be quicker, Your Honor, than like a remand with a vacant. Yes. But I want to come back to the idea that a remand isn't required because there is sufficient evidence in the record to show that the moist sites and the areas with the moist sites are not in the area where they're the roaded area of the project and the area where there will be open roads. Well, it seems like the district court trusted you, just basically said, okay, I believe you, and maybe it's true. We didn't just conclusively state that. It is also stated in the EA that we use the spatial habitat data and explain that the importance of the subalpine for habitat to mapping moist sites. I want to come back to one more thing on that issue, and that's the Glacier Loon analysis itself. The Glacier Loon project is directly adjacent to the Beaver Creek project. It's just north of the project. They share a border. If you look at the map of the Glacier Loon project analysis, the moist site analysis, you can see virtually all of the Beaver Creek subunit just south of the Glacier Loon subunit. And you can see on that map, that map doesn't show the moist sites in the Beaver Creek project area. It just shows the circles with the cross-hatching of the moist sites in the Glacier Loon project area. But if you look at the legend on the map, the legend shows the abeas laciocarpa habitat in green. And if you look on the map, you can see the green on the map isn't in the roaded area. And so then you've already got the map of the habitat type, essentially. I want to look at the map. Where is it? It's reproduced in the plaintiff's brief at page 9, but it's also in their motion to take judicial notice. It's Exhibit 1. The entire analysis is Exhibit 1. I've got the plaintiff's brief, and I'm on page 9, and I don't see a map. It must be somewhere else. Page 9 of the reply brief. Oh, I'm sorry. I was looking at the blue brief as well. They moved for notice of the Glacier Loon project in the reply brief here. Yes, here it is. And the map's in the – it's this map. Yeah, no, I've got it now in front of me. Yeah, yeah. And the one in the middle with the bubbles is the Glacier Loon subunit. And the Beaver Creek's right beneath it. And you can see virtually the entire roaded area of the Beaver Creek subunit. And you can see there's no splotchy green, which is, by the legend, it's the designation of the subalpine fur habitat that's associated with moist sites. So this just confirms what we said in the environmental assessment, that they used the data that showed where this habitat is and said it was away from the roads. Now, could they have done it more formally? Yes. We concede that. But the issue is, you know, did what they did, was that sufficient? And we submit that it was sufficient. And if it wasn't sufficient, I think this map, I mean, shows that it's harmless error because it shows you that the subalpine fur habitat is not in the area where the roads are. Unless the Court has further questions. Okay. Thank you. Thank you. Two minutes. I want to start by addressing Judge Kristen's question regarding whether they could still log this summer. The Beaver Creek subunit, because of the schedule, is actually designated inactive from 2017 to 2023. And you can find that in the record at ER-129, where it talks about what subunits are active versus inactive. So that means they couldn't just go out and do the logging this summer anyways because that unit is supposed to be inactive during the non-denning season for the grizzly bears. So basically, once they come out of their den in the spring until the fall, no logging can happen 2017 to 2023 in the Beaver Creek grizzly bear subunit. So the project couldn't go forward quickly this summer anyways. Regarding the opposing counsel's citation to the Glacier Loon map, again, that was not anywhere in the administrative record for this project, and the public never saw that map, and that is just a map of the moist sites in the Glacier Loon project. It's not a map of the moist sites in the Beaver Creek project. We want that map for the Beaver Creek project, and we need that as part of a public process. I think the reason it's in your brief at page 9 is because you were saying it's doable. They know how to do it. Exactly, exactly. And I just wanted to close by saying that, well, first, I looked at ER-325, and I didn't find any reference to data about moist sites. I looked at ER-325. I looked at the first draft of the environmental assessment at 325, and the second draft, I didn't see any of the data they just mentioned at that page. And finally, I just want to end with this quote from this very similar case, Wild Earth Guardian, 790 Fed Third at 927, where this court said, although the Forest Service asks us to assume the adequacy and accuracy of partial data without providing any basis for doing so, NEPA requires more. And so what we're asking for is just this analysis done in a NEPA process on remand, and then the injunction can be dissolved. Thank you. Okay. Thank you very much. Thank both sides for their arguments. Friends of the Wild Swamp versus CARES submitted for decision. And we'll take a 10-minute break, and then we'll come back and hear the last case.
judges: W. Fletcher, Callahan, Christen